**AMOCO PRODUCTION COMPANY,**
**Plaintiff,**

v.

**WESTERN SLOPE GAS COMPANY,**
**Defendant.**

**Civ. A. No. 80–W–1131.**

United States District Court,
D. Colorado.

April 6, 1982.

Gorsuch, Kirgis, Campbell, Walker & Grover by Charles W. McDermott, Robert J. Kapelke and Lawrence P. Terrell, and R. H. Landt, Denver, Colo., for plaintiff.

Kelly, Stansfield & O'Connell by James R. McCotter, Denver, Colo., for defendant.

## MEMORANDUM OPINION

WINNER, Senior District Judge.

■ The court has diversity jurisdiction of this case in which Amoco seeks to recover some $6-million more than the money already paid by Western Slope for gas delivered from wells in La Plata County, Colorado, and, if it is successful in collecting this $6-million, Amoco wants another $4-million more than Western Slope says will be owed for gas delivered in the future from those wells. When the lawsuit started, there were several questions to be resolved, but the parties have agreed to a resolution of all disputes except the single argument as to whether Amoco is entitled to charge Western Slope "new gas" prices for "old gas" sold from the La Plata County wells.

Amoco's claim for "new gas" prices stems from its reading of a letter agreement and the Natural Gas Policy Act, PL 95–621, 15 U.S.C. § 3301 et seq. Until a few days before trial there was a question in the case dealing with whether Amoco's efforts to enforce an indefinite price escalation clause were unenforceable because the clause was against public policy, but a negative answer was given to this question in *Kerr-McGee Corporation v. Northern Utilities, Inc. v. Amoco Production Company* (10 Cir. 1982) 673 F.2d 323. Amoco reads this decision to be a broad based license to charge the highest price available to anyone for all its gas, but I think that it settles only the single issue of public policy, and all other questions are open for decision in this court, astrict of Wyoming. In the Wyoming case the Tenth Circuit said the price charged could be the highest "price received by any producer selling interstate gas (and this provision) allowed the producers to receive the 'small producers' rate for intrastate sales (even though the producer was not a small producer)." As I read the opinion, all it holds is that a contract permitting this isn't against public policy if that's what the contract means, but, at least in this case, and perhaps in the Wyoming case, what the parties intended by their contract is a question remaining for decision and that is what I shall decide.

The parties have been doing business with each other in the sale and purchase of gas produced in La Plata County for more than 20 years, and the original 1961 contract has been amended from time to time by letter agreements. There is no reason to go back of the October 31, 1973, letter agreement which provided in material part:

"1. Effective January 1, 1974, through December 31, 1974, the price shall be thirty three cents (33¢) per MCF.

"a) For the one (1) year period commencing January 1, 1975 and for each succeeding one (1) year period thereafter for the next four (4) years, the price shall be increased one cent (1¢) per MCF over the price paid during the immediate preceding one (1) year period.

"b) In addition to the above, for the value of recoverable liquids contained in the gas deliverable, an additional two cents (2¢) per MCF shall be paid.

"2. The price or rate established from time to time by the Federal Power Commission (or any successor agency) as the area ceiling price or rate so authorized, for the specific area within which subject gas well or wells are located, subject to the general terms and conditions established by the FPC including heating value and applicability to specific wells."

The 33¢ price aimed at giving Amoco the same price it would receive if the gas were to be sold in interstate commerce plus any increases for interstate gas which might be allowed by the Federal Power Commission. The parties intended a direct tie of the price of the intrastate gas sale to the price permitted for interstate gas sales, and to this date, all negotiations and agreements between the parties were founded on this mutual intent. With the Middleast oil crisis, the industry was well aware that Congress was likely to make direct entry into the picture, and, accordingly when the agreement came up for renegotiation, both Amoco and Western Slope wanted to insert language intended to include anticipated legislation and both anticipated Congressional action concerning "new oil" and "old oil." Accordingly, a letter agreement of July 21, 1978, was entered into, and, with the material changes from the 1973 agreement italicized, it said:

"1. Effective January 1, 1979, *the price shall be fifty-five cents (55¢) per Mcf* at 14.73 psia plus reimbursement to Seller of 100% of all existing and future taxes referred to in Article IV 4.1, notwithstanding Article IV 4.2.

"(a) For each succeeding one (1) year period thereafter, the price shall be increased one cent (1¢) per Mcf at 14.73 psia.

"2. The price or rate established from time to time by *the enactment of any federal law or by the Federal Energy Regulatory* Commission (or any successor

agency) as the ceiling price or national rate for the specific area within which subject gas well or wells are located, subject to the same general terms and conditions applicable to such price or rate, *including but not limited to quality, pressure and vintage conditions.*"

Congress acted three months after the 1978 agreement was signed and two months before it took effect. Insofar as resolution of this case is concerned, the most important provisions of the Natural Gas Policy Act are its sections 102 [15 U.S.C. § 3312] and § 105 [15 U.S.C. § 3315.] The pertinent parts of those two sections of the Act read:

"§ 3312. Ceiling price for new natural gas and certain natural gas produced from the Outer Continental Shelf

"(a) Application.—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of—

"(1) new natural gas; and

"(2) natural gas produced from any old lease on the Outer Continental Shelf and qualifying under subsection (d) of this section for the new natural gas ceiling price.

"(b) Maximum lawful price.—The maximum lawful price under this section for any month shall be—

"(1) $1.75 per million Btu's, in the case of April 1977; and

"(A) shall only apply to natural gas produced in the United States;

"(B) shall apply to the month of delivery without regard to the date of the sale or the date of the contract under which the sale occurs; and

"(C) shall not apply to deliveries occurring before the first day of the first month beginning after November 9, 1978.

"(5) Sales qualifying under more than one provision.—If any natural gas qualifies under more than one provision of this subchapter providing for any maximum lawful price or for any exemption from such a price with respect to any first sale of such natural gas, the provision which could result in the highest price shall be applicable."

§ 3315. Ceiling price for sales under existing intrastate contracts

"(a) Application.—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.

"(b) Maximum lawful price.—

"(1) General rule.—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—

"(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or

"(B) the maximum lawful price, per million Btu's, computed for such month under section 3312 of this title (relating to new natural gas)."

Amoco says that combining its letter agreement with the language of § 3315(b)(1)(B) permits it to charge "new gas" prices for "old gas," and that this is what the parties intended by their agreement. Western Slope argues that there was no such intention when the 1978 letter agreement was negotiated, and that it was to protect against this result that the phrase, "including but not limited to quality, pressure and vintage conditions," was added to the 1973 language. [It is to be noted that no such phraseology appears in the Wyoming agreement discussed in *Kerr-McGee v. Amoco, supra*, and footnote 7 of the Tenth Circuit opinion specifically notes that, "Moreover, paragraph 6(b) contains no vintaging distinction between old and new gas."] I have not the slightest doubt that, as was testified to by Mr. Valenta, the purpose of adding the language to the 1978 agreement was to be sure that the intrastate sale by Amoco to Western Slope

would be protected by any vintaging sections of the then proposed law which applied to gas sold in interstate commerce. Although Mr. Barrett said that such was not the intention of Amoco, his "minutes" which are part of the company records don't jibe with his testimony. Those minutes, dated in July, 1978, say [italics supplied]:

"Amending contract # 48606 with Western Slope Gas Company consistent with the 5 year price redetermination provision to increase the price of gas from 39¢/Mcf to 55¢/Mcf effective January 1, 1979 plus 1¢ each year thereafter. Such price shall be adjusted for Btu and taxes. *Under the Amendment, Amoco may receive a higher price if gas of the same vintage is sold from the field in interstate commerce at a price higher than the stipulated contract price.* Either party may terminate the gas contract in 1981."

Mr. Barrett's claim at time of trial that he changed his mind between the time he prepared the minutes, July 18, 1978, and the date he signed the contract, August 2, 1978, was less than convincing. He surely knew what Western Slope thought the letter agreement meant, and at no time did he tell Western Slope that his agreement with the intended meaning of the July 21, 1978 letter (written three days after the minutes) had undergone a 180 degree change. The testimony convinced me that Amoco was engaged in a broad program to try to get the highest possible price for its production under the Energy Act which was then under consideration by Congress, and that Amoco knew full well that Congress would grant price concessions to "new oil" and to small producers. I haven't the slightest doubt that Amoco negotiated this contract and all others with a full awareness of the proposals pending in Congress, and, as Mr. Barrett readily agreed, Amoco wanted to get the top price for all of its product whether it was or was not "dedicated or committed to interstate commerce," and it wanted to take intrastate advantage of Congressional largesse to small producers. Amoco's thinking was that under the new Act interstate gas might bring a higher price, and Amoco wanted to get its intrastate sales on the same footing as its interstate sales. Its customers had no objection to this, but neither Amoco nor its customers negotiated for a much higher price to be paid for intrastate sales than could be charged for interstate sales. Purchasers didn't negotiate to pay "new gas" prices for "old gas," and they didn't intend to pay small producer prices to the majors. Amoco stretches beyond my credulity the meaning and intention of 15 U.S.C. § 3315(b)(1)(B) and the 1978 letter agreement when it argues that Western Slope agreed to pay "new gas" prices for gas it had been buying from Amoco since 1961. Under the 1978 agreement Western Slope owed Amoco 55¢ per Mcf, but under the legerdemain of Amoco's reasoning, that price went up to $2.07 per MmBtu the instant the new Act was signed. [MmBtu and Mcf are not exact equivalents, but they approximate each other, and it is fair to say that Amoco's claim represents an instant increase of approximately 400%.]

I do not think that the parties intended any such absurd result, and I accept the testimony of Mr. Valenta and reject the testimony of Mr. Barrett—especially in light of the minutes he prepared in July, 1978. Common sense dictates this result. Two large companies represented by experienced negotiators worked out this agreement. Because of the location of the wells, there were only three possible customers. They were two interstate pipelines and Western Slope. [In minutes of a November, 1973, meeting, Amoco said that the only other prospective customer was El Paso, one of the interstate pipelines.] I accept the testimony that Western Slope knew that all it had to do to make the purchase was to meet or perhaps better just a little bit the price Amoco could get for its gas sold to one of the interstate pipelines. Yet, Amoco argues that Western Slope agreed to pay 400% of the price an interstate pipeline would have to pay for the gas. Western Slope agreed to no such thing, and I don't think that such was the intent of Amoco when the agreement was signed.

However, if Amoco really intended the agreement to be that Western Slope would be obligated to pay "new gas" prices for gas it had been buying since 1961 [even with the vintage language added to the contract] there was no meeting of the minds. If there was no meeting of the minds, *quantum meruit* would provide the guide. With only Western Slope and two other possible purchasers present in the marketplace, the price the other two purchasers would pay would set the reasonable value, and that price is clearly limited by the statute. The reasonable value would be the price for "old gas", because even Amoco can't think up an argument permitting it to charge "new gas" prices for "old gas" dedicated to interstate commerce.

Accordingly, judgment shall enter in favor of the defendant, and defendant is awarded its costs.