CITY OF FARMINGTON, Plaintiff and Counterdefendant,

v.

AMOCO GAS COMPANY, Defendant and Counterclaimant.

Civ. No. 81–0360 HB.

United States District Court, D. New Mexico.

April 19, 1983.

Charles F. Wheatley, Jr. and Michael J. Thompson, Wheatley & Wollesen, Washington, D.C., Felix Briones, Briones & Pittard, P.A., Farmington, N.M., for plaintiff and counterdefendant.

J. Paul Douglas, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., Edward B. Hinders, Houston, Tex., Kemp Garthy, Campbell, Byrd & Black, P.A., Santa Fe, N.M., for defendant and counterclaimant.

## MEMORANDUM OPINION

BRATTON, Chief Judge.

This case involves the construction and interpretation of an indefinite price escalator clause in an intrastate gas purchase contract. Trial of the factual issues has been held, the legal issues have been exten- sively briefed, and the case now comes before the court for final decision on its merits. This memorandum opinion constitutes the findings of fact and conclusions of law of the court.

Plaintiff City of Farmington is a municipal corporation organized and existing under the laws of New Mexico and located in San Juan County, New Mexico. Farmington is engaged in the generation, transmission and retail distribution of electric power and energy to its residents. Defendant Amoco Gas Company is a Delaware corporation that sold and distributed gas to Farmington for use in the City's electric generating plant pursuant to an "Industrial Gas Sales Contract" which the parties entered into on September 28, 1961. On September 15, 1971 Amoco and Farmington entered into an "Amendment to Gas Contract" which amended several provisions of the 1961 contract. The Amendment was for a period of ten years commencing October 1, 1971 and contained the following price provision (hereinafter referred to as "¶ B"):

### ARTICLE IV

### PRICE

. . . .

B. Commencing October 1, 1972, and thereafter to October 1, 1981, the price per MMBtu specified in Paragraph A above shall be increased but not decreased from time to time to maintain a minimum price differential of [1.5 cents] in relation to and higher than the then current Federal Power Commission (FPC) area price in cents per MCF for gas of this contract vintage and same quality as sold in the San Juan Basin Area as set forth by the FPC consisting of [named counties in Colorado and New Mexico including La Plata County, Colorado, and San Juan and Rio Arriba Counties, New Mexico]. As used herein, the term "contract vintage" shall mean contracts entered into after June 17, 1970, and before October 1, 1973. Accordingly, should the FPC, or any successor governmental au-

thority having similar jurisdiction, allow, by order following hearing, or by settlement, for the San Juan Basin Area[,] a just and reasonable area price higher than [24.0] cents per MCF for gas of this contract vintage, then the price to be paid by Buyer to Seller for gas under this contract shall be increased as hereinabove provided to be effective on the date such order is issued or settlement agreement approved by the Commission.

## NATURE OF THE PRICE ESCALATION CLAUSE

Paragraph B is a provision known generically as an indefinite price escalator clause. Both parties agree that it is an "area rate" or "FPC" clause which tied price increases under the Amendment to the actions of the Federal Power Commission (after October 1, 1977, its successor, the Federal Energy Regulatory Commission). They disagree, however, as to the nature of that clause and the manner in which it operated to escalate the contract price in the context of a regulatory environment which changed after June 21, 1974.

■ In interpreting the contract the determinative issue is the intent of the parties at the time the contract was made. This requires the court to consider the language of the contract, its purposes, and the circumstances of its execution, i.e. its commercial and regulatory context. *Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360, 388 (5th Cir.1981).

When the parties executed the Amendment in 1971 the FPC prescribed the price for gas sold in interstate commerce according to a contract vintage system. Under this system the Commission prescribed two area rates: one area rate applied to gas sold pursuant to contracts dated prior to an arbitrarily selected dividing date—"old" gas; the second, generally higher, area rate applied to gas sold pursuant to contracts dated on or after that dividing date—"new" gas. Thus, the price for gas sold under a particular contract was determined solely by the date on the face of the contract.

In Order 435, issued only two months before the parties executed the Amendment, the FPC established an initial rate of 24¢ per Mcf for gas sold under contracts dated after June 17, 1970,[1] in the San Juan subarea of the Rocky Mountain Area. This was then the interstate price for "new" gas. The parties obviously drafted ¶ B with an eye to Order 435. The initial base price in ¶ B is 24¢, the area price established in Order 435. Paragraph B refers to "contract vintage," the vintaging concept employed in Order 435. The date June 17, 1970 used in the definition of "contract vintage" in ¶ B, was the dividing date between "old" and "new" gas selected in Order 435. (The closing date of the contract vintage interval in ¶ B, October 1, 1973, was possibly chosen because it was exactly one year after ¶ B became effective.) The definition of the San Juan Basin Area in ¶ B is identical to that in Order 435.

■ The court is convinced that the parties intended to incorporate the concept of vintaging into their price escalation clause. Farmington attempted to prove this by introducing evidence of the parties' contract negotiations, the circumstances of the parties and the testimony of three City Councillors as to their understanding of the 1971 Amendment. This evidence merely supplements what is already evident from the language of ¶ B itself and the regulatory context.

Paragraph B refers twice to the Commission area price for "gas of this contract vintage." The term "contract vintage" is particularly defined. The parties undoubtedly anticipated that the FPC would continue to prescribe area rates solely by looking to the date on the face of a contract and that at some time in the future the FPC would issue an order establishing a new dividing date between "old" gas and "new" gas. If that date had been after October 1,

1973, the date set in ¶ B as the terminal date for their "contract vintage," the gas sold under this contract would then have become "old" gas. The parties expressed clearly their intent (1) to incorporate vintaging into the contract as vintaging was then practiced by the FPC and (2) that Amoco would receive the FPC price for "new" gas only until the FPC established a date after October 1, 1973 as the dividing date between "old" and "new" gas.

Much of Amoco's argument and evidence, in the pre-trial motions and at trial, was directed toward establishing that ¶ B was a third party favored nations clause which would allow Amoco to charge Farmington the highest price received by any seller in the San Juan Basin. Amoco now contends only that ¶ B is a "form or type" of third party favored nations clause that "was triggered whenever the Commission or successor governmental authority prescribed an area price higher than 24.0¢ per Mcf for gas of the defined 'contract vintage.'" With this latter construction the court can fully agree.

## THE 699 OPINIONS

The parties had no difficulty interpreting their contract, or applying the escalator clause to determine the price under the contract, until 1974 when the Commission issued Opinion Nos. 699, 699–A and 699–H.[2] Issued on June 21, 1974, Opinion No. 699 established a base national rate of 42¢ per Mcf for three categories of interstate gas sales:

(1) gas sold from wells commenced on or after January 1, 1973; or

(2) gas sold pursuant to contracts executed on or after January 1, 1973, for . . . gas not previously sold in interstate commerce (commonly known as "new dedications"); or

(3) gas sold pursuant to contracts executed on or after January 1, 1973, where the sales were formerly made pursuant to permanent certificates of unlimited duration under contracts which expired by their own terms on or after January 1, 1973 (commonly known as "replacement contracts").

Opinion No. 699–A revised the "contract executed" language of the second category to read "sales initiated on or after January 1, 1973." In Opinion No. 699–H, issued December 4, 1974, the Commission increased the base national rate to 50¢ per Mcf, retained the "sales initiated" language of 699–A, and revised the third category of sales which qualified for the 50¢ national rate to read:

Sales made pursuant to contracts executed prior to or subsequent to the expiration of the term of the prior contract where the sales were formerly made pursuant to permanent certificates of unlimited duration under such prior contracts which expired of their own terms on or after January 1, 1973, or pursuant to contracts executed on or after January 1, 1973, where the prior contract expired by its own terms prior to January 1, 1973.

Opinion No. 699–H also set a base area rate of 35¢ per Mcf for sales of gas in the Rocky Mountain Area from wells commenced prior to January 1, 1973 and sold pursuant to contracts dated on or after October 1, 1968.

On the basis of the national rates established in these Opinions, Amoco charged Farmington 43.5¢ per Mcf for deliveries made from June 24, 1974 to December 4, 1974 and 51.5¢ per Mcf for deliveries made from December 4, 1974 to August 1, 1976. (All prices charged included the 1.5¢ per MMBtu differential established in ¶ B.) Farmington made all payments for deliveries from July 1, 1974 until the termination of the contract on October 1, 1981 under protest.

The Opinion 699 series marks a change in the Commission's ratemaking methodology from contract date-based vintaging to well commencement date-based vintaging. The Commission first announced its intention to

---

**2.** Just and Reasonable National Rates for Sales of Natural Gas, Opinion No. 699–H, 52 F.P.C. 1604 (1974), *aff'g and modifying* Opinion No. 699, 51 F.P.C. 2212 (1974) and Opinion No. 699–A, 52 F.P.C. 263 (1974), *aff'd sub nom., Shell Oil Co. v. FPC,* 520 F.2d 1061 (5th Cir. 1975), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976).

effect this change in its vintaging practice in 1972 with Opinion No. 639.[3] It first proposed to establish a uniform national rate based on well commencement date in a Notice of Proposed Rulemaking issued on April 11, 1973, in Docket No. R–389–B, Just and Reasonable National Rates for Future Sales of Natural Gas, 38 Fed.Reg. 10014 (1973).

■ Amoco seems to contend that it was entitled to charge the 42¢ and 50¢ national rates because the second category of sales which qualified for those rates—"sales initiated on or after January 1, 1973" for gas not previously sold in interstate commerce—comes within the contract vintage period set in ¶ B. This construction equates the "sales initiated" language applicable to new dedications in the 699 Opinions with the "contract executed" language of ¶ B. While the court does not find this to be an unreasonable construction of either the Opinions or ¶ B, the third category of sales which qualified for the national rates provides further justification for the rates Amoco charged. Although the parties agree that this was not a replacement contract, that category of sales qualified for the 42¢ and 50¢ rates if made pursuant to contracts executed on or after January 1, 1973. Contracts made between January 1, 1973 and October 1, 1973 fall within the contract vintage period set in ¶ B.

Farmington contends that, because the additional conditions which the Commission placed on sales initiated or contracts executed, on or after January 1, 1973, in order to qualify them for the higher rates were not met by Amoco's sales to Farmington, the 42¢ and 50¢ rates did not apply. Undeniably, there were no new dedications of gas by Amoco on or after January 1, 1973, the Farmington-Amoco transaction did not involve a replacement contract, and if this gas had been sold in interstate commerce Amoco could not have charged these rates. But the gas was not sold in interstate commerce.

The parties took great pains in their original 1961 contract and the 1971 Amendment to ensure that this was an intrastate sale of gas not subject to the Commission's jurisdiction. The parties expressly stated that the gas would be used only in Farmington's generating plant, that it was not to be resold, and that it was not to be transported or sold in interstate commerce. If the parties had intended to limit the price to the rates which a producer could have charged had the gas been sold in interstate commerce, they easily could have drafted an escalator clause to achieve that purpose. Unlike the parties in *Tuthill v. Southwestern Public Service Company,* 614 S.W.2d 205, 208–10 (Tex.Civ.App.1981) they did not limit the price to the 'applicable' area price. Nor did they include the terms "'as if [the gas] were sold in interstate commerce,' or 'as if it were subject to the [Commission's authority],'" *Amoco Production Co. v. Stauffer Chemical Co.,* 612 P.2d 463, 467 (Wyo.1980), accord, *C.F. Braun & Co. v. Oklahoma Gas & Electric Co.,* 603 F.2d 132, 133 (10th Cir.1979) or provide that the price would be determined in accordance with "the same general terms and conditions applicable to such price or rate [prescribed by the Commission or successor governmental agency], including . . . vintage conditions," *Amoco Production Co. v. Western Slope Gas Co.,* 535 F.Supp. 1305, 1306–7, 1308 (D.Colo.1982).

The parties provided that the contract price would escalate each time four criteria were satisfied: (1) the "Commission or successor governmental authority having similar jurisdiction" prescribed a price, (2) the price prescribed was an "area price," (3) the "area price" applied to sales in the San Juan Basin Area as defined in ¶ B, and (4) the "area price" applied to gas of the defined "contract vintage." These four criteria were satisfied with the issuance of the 699 Opinions. The parties intended the Commission rate opinions to be used merely as a gauge for setting the price under the contract; nowhere on its face does the contract indicate that all the terms and condi-

---

**3.** Area Rates for the Appalachian and Illinois Basin Areas, 48 F.P.C. 1299 (1972), *reh. denied,* 49 F.P.C. 361 (1973), *aff'd, Shell Oil Co. v. FPC,* 491 F.2d 82 (5th Cir.1974).

tions of the Commission's rate opinions were intended to apply to the Amoco-Farmington sale. The additional conditions which producers of gas for sales in interstate commerce had to meet to qualify for the 42¢ and 50¢ rates set in the 699 Opinions, i.e., that the sales were made pursuant to new dedications or replacement contracts, were simply not applicable to this sale.

The court assumes, without deciding, that the evidence Farmington offered in support of its theory (that the parties intended the price to be no more than that which could have been charged if the gas had been sold in interstate commerce) was not inadmissable "extrinsic evidence offered to vary or contradict rather than to explain and interpret" the terms of the contract. *Pennzoil Co. v. Federal Energy Regulatory Commission*, 645 F.2d 360, 388 (5th Cir.1981). Having considered the proffered evidence, the court nevertheless finds that it does not mandate the acceptance of Farmington's interpretation, especially in light of the clear, unambiguous language of the contract.

## THE SMALL PRODUCER DIFFERENTIAL

On August 28, 1975 the Commission issued Opinion No. 742[4] creating the "small producer differential" which allows small producers to collect 130% of the area or national rate which would apply to a sale if it were made by a large producer. Amoco did not charge the small producer differential for any gas delivered under the contract. By its Counterclaim Amoco now asserts that it was entitled to collect a base price which reflected the 130% differential from August 28, 1975 until the issuance of either Opinion No. 770–A or the Natural Gas Policy Act ("NGPA").

■ Farmington conceded that Amoco was entitled to the small producer differential in its "Memorandum in Opposition to Motion of Amoco Gas Company for Partial

Summary Judgment": "because it was applicable to all gas of all vintages, this differential also applied to gas of 'this contract vintage' as that term is used in [Paragraph B]." Farmington now contends that this concession did not constitute a binding admission. Although the court assumes that Farmington's unqualified statement was not a binding admission, it finds that Farmington's former position was correct and that Amoco was entitled to collect a base price which reflected the small producer differential from the date of the issuance of Opinion No. 742.

Farmington now argues that the small producer prices should not apply because the parties did not intend them to. When Amoco and Farmington executed the Amendment in 1971, the Commission did not regulate small producer prices directly. The area prices then set by the Commission applied only to large producers. From these facts Farmington concludes that by tying their price to the "area price," the parties must have intended to make the Commission's price for large producers the basis of their bargain.

Paragraph B does not distinguish between area rates allowed for large producers and small producers. It simply provides for escalation whenever the Commission, or any successor governmental authority, allows a just and reasonable price higher than 24.0¢ per Mcf for the San Juan Basin Area. The prices allowed for small producers under Opinion No. 742 were just and reasonable, they were higher than 24.0¢ per Mcf, they were "area prices" (i.e., generally applicable rates as opposed to a rate allowed for a particular sale), and they applied to small producers in the San Juan Basin Area. Paragraph B permits collection of the 130% small producer differential.

## THE 770 OPINIONS

On November 5, 1976 the Commission issued Opinion No. 770–A which affirmed,

---

**4.** Small Producer Regulation, Opinion No. 742, 54 F.P.C. 853 (1975), *reh. denied,* Opinion No. 742–A, 56 F.P.C. 637 (1976), *clarified,* Opinion No. 742–B, 56 F.P.C. 757 (1976), *reh. denied,* 56 F.P.C. 2873 (1976), *clarified and amended,* 56 F.P.C. 3734 (1976).

modified and clarified Opinion No. 770.[5] Opinion No. 770–A established national rates of $1.42 and $.93 for gas sold from wells commenced after December 31, 1974 and December 31, 1972 respectively, without regard to the date of the contract. The rate for gas (1) from pre-1973 wells which was first dedicated to interstate commerce on or after January 1, 1973, or (2) sold pursuant to replacement contracts executed on or after January 1, 1973, was limited to 52¢ per Mcf. Amoco charged Farmington a base price of $.945 per MMBtu for gas delivered between August 1, 1976 and April 1, 1980.

By its Counterclaim Amoco seeks to recover a base price of $1.435 per MMBtu, the rate set in Opinion No. 770–A for gas sold from wells commenced after December 31, 1974. It bases its claim on the fact that this rate could have been collected for gas sold in interstate commerce pursuant to a contract of any date, including a contract dated between June 17, 1970 and October 1, 1973, provided only that the well which produced the gas was commenced after December 31, 1974. This construction fails to give effect to the parties' intention to incorporate vintaging into the escalation clause; although it gives lip service to the contract definition of "contract vintage" by looking to the price collected under other contracts dated between June 17, 1970 and October 1, 1973, it ignores entirely the fact that this definition was intended to correspond to a vintage of gas and not just any gas.

In the alternative, Amoco argues that it was entitled to the $.93 rate because that rate applied to gas produced from wells commenced during the contract vintage period defined in ¶ B. Without conceding that the well commencement dates adopted in Opinion No. 770–A were a limitation on escalation pursuant to ¶ B, Amoco suggests that if well vintaging concepts are to be incorporated into ¶ B, they should be incorporated using the dates which define the "contract vintage" period. This incorpora-

tion would modify ¶ B, to provide that the contract price would be the area price allowed for wells commenced after June 17, 1970 and before October 1, 1973. Opinion No. 770–A allowed $.93 per Mcf for gas from wells commenced between January 1, 1973 and October 1, 1973, therefore, Amoco concludes that it was entitled to the $.93 rate it collected.

There is no justification for transforming the period that the parties used to define their contract vintage into a period defining well commencement vintage. There is no apparent correlation between the two vintaging concepts and certainly not the simplistic correlation implicit in Amoco's suggestion.

Amoco also justifies the $.93 rate by arguing that this rate was allowed for gas sold pursuant to contracts executed during the period defined in ¶ B, provided only that the gas was produced from wells commenced after December 31, 1972 and before January 1, 1975. This is the same argument Amoco makes in regard to the $1.42 rate; it has the same shortcomings in this context.

Farmington argues that none of the gas sold by Amoco came from wells drilled on or after January 1, 1975, or on or after January 1, 1973, that there were no new dedications or replacement contracts, therefore the gas did not meet the conditions which would qualify it for the $1.42, $.93 or $.52 rates set in Opinion No. 770–A. This is the same argument Farmington makes in regard to the 42¢ and 50¢ rates established by the 699 Opinions; it also has the same shortcomings in this context. Farmington concedes that if Amoco is entitled to the 50¢ rate set in Opinion No. 699–H, it is also entitled to the 52¢ rate set in Opinion No. 770–A. Having determined that Amoco correctly charged the 50¢ rate, the court concludes that Amoco was entitled to

---

5. National Rates for Jurisdictional Sales of Natural Gas, Opinion No. 770, 56 F.P.C. 509, *reh. denied*, Opinion No. 770–A, 56 F.P.C. 2698 (1976), *aff'd sub nom., American Public Gas Association v. FPC*, 567 F.2d 1016 (D.C.Cir. 1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

charge the base rate of 52¢ (times the small producer differential) under 770–A.

Although the Commission's alteration of its vintaging practices prevents the literal correlation of the terms of ¶ B with the Commission's rate opinions, the parties intention to incorporate a vintaging concept into the price escalation clause can still be fulfilled. The 50¢ rate in Opinion No. 699–H and the 52¢ rate in Opinion No. 770–A applied (1) to gas sold pursuant to replacement contracts executed on or after January 1, 1973 and (2) to new dedications of gas to interstate commerce where the sales were initiated on or after January 1, 1973. This category of gas comes closer to the vintage to which the parties tied their price than any of the other categories established by the Commission in those Opinions.

The parties could not foresee that the Commission would alter its rate making methodology, replacing contract vintaging with well commencement vintaging. Nevertheless, they expressed clearly their purpose to limit the contract price escalations to a specific vintage of gas. They defined the vintage to which they chose to link their price in terms of the Commission's then vintaging methodology. Although that methodology changed, the intent of the parties to incorporate vintaging into the contract price can still be fulfilled.

## THE NATURAL GAS POLICY ACT OF 1978

On November 9, 1978 Congress passed the Natural Gas Policy Act, 15 U.S.C. §§ 3301, et seq., wherein it reassumed the ratemaking authority it had delegated to the Commission and exercised that authority itself, establishing maximum lawful prices for interstate sales of natural gas and all first sales of natural gas, whether sold in interstate or intrastate commerce. Amoco did not increase its charges to Farmington immediately upon the enactment of the NGPA but continued to collect a price which reflected the base rate of $.93 per Mcf until April 1, 1980. From April 1, 1980 to April 1, 1981 Amoco used a base rate of $1.44 per Mcf as prescribed in the New Mexico Natu-

ral Gas Pricing Act, N.M.Stat.Ann. §§ 62–7–1, et seq. (Supp.1982). Amoco now admits that the New Mexico Act did not apply. From April 1, 1981 through October 1, 1981 Amoco collected a base price equal to the NGPA's § 102 price. By its Counterclaim Amoco seeks to recover the difference between base prices equal to the § 102 price and the prices actually charged for the gas delivered from December 1, 1978 through October 1, 1981.

The parties agree that § 105 of the NGPA, 15 U.S.C. § 3315(b)(1), prescribes the maximum lawful price for the gas sold under their contract. They also agree that whether ¶ B authorized Amoco to collect the § 102 price pursuant to § 105(b)(1) presents two questions: (1) is Congress a "successor governmental authority having similar jurisdiction" within the meaning of ¶ B; and (2) does § 105(b)(1) permit the price under the contract to rise to the price prescribed in § 102 of the Act, 15 U.S.C. § 3312.

Paragraph B provides for an increase in the contract price when the Commission "or any successor governmental authority having similar jurisdiction allows[s], by order following hearing, or by settlement," an area price higher than 24¢ per Mcf. Congress is the "successor" of the Commission. *Pennzoil,* 645 F.2d at 389, n. 60. Farmington, however, argues that Congress is not "a successor governmental authority" within the meaning of ¶ B. Whether Congress is included within that term is, of course, a question of the intent of the parties.

Farmington contends that the word "similar" limits the qualities of successors which could alter the contract price. In the plaintiff's view, Congress' jurisdiction is not similar to the Commission's because Congress has plenary power to regulate the sale and transportation of natural gas, while the Commission possesses only the authority delegated to it by Congress. Farmington also finds words of limitation in the phrase "by order following hearing, or by settlement." Congress does not act by order or by approving settlements, so plaintiff concludes that the parties intended that ¶ B

would be triggered only by acts of administrative agencies, after adversary participation and opportunity for judicial review, rather than by legislative fiat.

Both Congress and the Commission possess the authority to establish just and reasonable rates for the sale of natural gas; in that respect their jurisdictions are similar. Also, in prescribing maximum lawful prices both Congress and the Commission exercise legislative functions. The use of the term "authority" indicates that the parties intended "to make pricing a matter tied to governmental decision whenever [and however] the government chose to act." *Pennzoil,* 645 F.2d at 389 n. 59.

■ The reference in ¶ B to rates set "by order following hearing, or by settlement," could indicate that the parties intended to limit "successors" to administrative agencies, but a more reasonable interpretation is that it merely reflects the Commission's ratemaking practices in 1971 when the parties executed the Amendment. As did the Commission, this court concludes, from the language of the contract and its regulatory and commercial context, that the parties "meant to contract for whatever regulated rate was available, and not necessarily to ... limit the *source* of those ceilings." 645 F.2d at 389. Congress is a "successor governmental authority" within the meaning of ¶ B.

Section 105(b)(1) of the NGPA provides that the maximum price for gas sold in intrastate commerce under a contract existing on November 8, 1978, is the lower of:

(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month under section [102] of this [Act] (relating to new natural gas).

This section permits the price in existing intrastate contracts to escalate up to the price prescribed in § 102, the lawful ceiling. The NGPA does not trigger such escalations automatically though. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* — U.S. ——, ——, 103 S.Ct. 697, 709–10, 74 L.Ed.2d 569 (1983). Escalation will occur only if the contract in question contains a pricing mechanism which allows collection of the § 102 price. The Amoco-Farmington contract does not contain a sufficient escalation mechanism.

Since § 105 provides that the maximum lawful price is the lower of the contract price on November 9, 1978 or the § 102 price, it is necessary first to determine the price under ¶ B on November 9, 1978. Section 104 of the NGPA essentially carries forward the area and national rates existing on November 8, 1978, while adding to them the monthly inflation adjustment factor prescribed in § 101 of the Act. 15 U.S.C. §§ 3311, 3314; *Pennzoil,* 645 F.2d at 380 n. 39. Pursuant to § 104 the price under ¶ B on November 9, 1978 was the same as the price on November 8, 1978— 52¢ per Mcf (times the small producer differential), a price lower than the § 102 price for December, 1978. 18 C.F.R. § 271.101(a) (Table I). In accordance with § 105 the base price under ¶ B after enactment of the NGPA was the lower price, increased each month by the monthly inflation factor to the prices established in 18 C.F.R. § 271.101(a) (Table II).

Amoco argues once again that, because § 105(b)(1) governs intrastate contracts executed between June 17, 1970 and October 1, 1973, the § 102 price, as used in § 105(b)(1), was a price for gas sold under contracts of the vintage defined in ¶ B. This argument has no more merit in this context than it did in the context of the Commission's 699 and 770 series Opinions. The parties' intended to incorporate the vintaging concept into the price escalation clause; they did not intend to allow Amoco to charge the highest lawful price for any gas that is sold pursuant to contracts of the appropriate date. Amoco's construction of ¶ B fails to respect this distinction.

Amoco dwells at length on the fact that § 105 permits price escalation clauses to operate according to their terms and to escalate the price paid thereunder up to

that prescribed in § 102. Although this is true, it is irrelevant. When ¶ B operates according to its terms it does not escalate the price to the highest permitted by § 105 for any gas, it merely escalates the price to the rate for gas of the appropriate vintage. That rate was established in Opinion No. 770–A as discussed *supra.*

Amoco also contends that the classification of some of the gas sold to Farmington from December 1, 1978, through October 1, 1981, as "stripper well natural gas," as defined in Section 108(b)(1) of the NGPA (15 U.S.C. § 3318(b)(1)), authorized the collection of the § 102 price for all gas delivered during this period. This argument was first advanced by Amoco in its Post-Trial Brief. In support thereof Amoco tendered into evidence certain documents as late filed exhibits. Although the court has considered these documents, it finds irrelevant the fact that the gas from the Gallegos Canyon Unit # 9 well would have qualified for the § 108 price had the price at which it could be sold to Farmington not been limited by ¶ B.

Farmington has raised a number of equitable defenses to Amoco's Counterclaim. It is not clear whether plaintiff intended these defenses to apply to the situation here, where the court finds that Amoco was entitled to charge less than it did but more than Farmington had wished. Nevertheless, the court has considered these defenses and finds them inapplicable.

This opinion does not address the price Amoco was authorized to collect for gas delivered to Farmington from January 19, 1982 through April 16, 1982 pursuant to the preliminary injunction. The court herein decides only the prices Amoco was entitled to collect under the contract, the issue raised by Count I of the Complaint. Farmington must pursue its claim for a refund

for deliveries made under the preliminary injunction before the Commission.

In summation, the court holds that under the 1971 Amendment Amoco was entitled to collect prices which reflect the following base rates: [6]

(a) $.50 from June 21, 1974 to August 27, 1975;

(b) $.50 times 130% from August 28, 1975 through July 26, 1976;

(c) $.52 times 130% from July 27, 1976 through November 8, 1978;

(d) $.52 times 130% adjusted by the monthly inflation factor prescribed by § 101 of the NGPA from November 9, 1978 through October 1, 1981.[7]

Farmington is entitled to a refund of the difference between the prices Amoco was authorized to collect and the prices actually charged. Plaintiff will submit an order in accordance with this opinion within 15 days, after having circulated it to opposing counsel for approval as to form.

---

**6.** The prices shown are base prices which do not include the 1.5 cents per MMBtu differential specified in ¶ B.

**7.** Amoco did not argue that it was entitled to the small producer differential after enactment of the NGPA, but relied entirely on its contention that ¶ B authorized collection of the § 102

price. *Had it been entitled to the § 102 ceiling price,* Amoco could not have collected the 130% differential. Because Amoco could correctly charge only the lower § 104 price, the court finds that *the small producer differential* applied and should be computed into the base price even after the passage of the NGPA.