**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 953, et al., Plaintiffs, Intervenors-Appellees,**

v.

**CENTRAL NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellant.**

No. 73-1813.

United States Court of Appeals, Tenth Circuit.

Argued May 15, 1974.

Decided July 30, 1974.

Rehearing Denied Aug. 27, 1974.

John M. Eaves, Albuquerque, N. M. (Malcolm L. Shannon, Jr., and Kool, Kool, Bloomfield, Eaves & Mayfield, on the brief), and Don S. Willner, Willner, Bennett, Meyers, Riggs & Skarstad, Portland, Or., for plaintiffs, intervenors-appellees.

C. Vance Mauney, Albuquerque, N. M. (Nielson, Conder, Hansen & Henriod, Salt Lake City, Utah; and Botts, Botts & Mauney, Albuquerque N. M., on the brief), for defendant-appellant.

Before LEWIS, Chief Judge, and HOLLOWAY and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a breach of contract case wherein a policyholder made claim against an insurance company for damages arising out of the insurer's unlawful cancellation of an insurance policy. In a trial to the court, sitting without a jury, the policyholder prevailed and the insurance company now appeals. The principal issue raised on appeal is whether under the circumstances of this case a mistake by the insurance company's agent in computing the premium rate is grounds for rescission. The trial court concluded that it was not, and we agree. Reference to the background facts will place the several related issues in context.

The plaintiffs are eight unincorporated local unions of the International Union of Operating Engineers which operate in New Mexico, Arizona, Wyoming, Oregon and Washington. The Western States Conference of Operating Engineers (WCOE) is a voluntary unincorporated association of local unions, including the eight locals which are the present plaintiffs, organized for the purpose of assisting the local unions in solving their common problems by serving

as a clearing house. The locals, however, are themselves autonomous, and WCOE has no power or authority, as such, over them.

In the latter part of 1970, numerous locals in WCOE, though by no means all, were interested in obtaining group life insurance coverage under a single master group policy, through which they hoped to obtain a lower premium rate than many of them were then individually paying because of the larger number of lives which would be thus insured. To further this aim, WCOE was authorized by the locals to gather information and obtain for the interested locals a group life insurance policy along the lines indicated.

In attempting to secure such a group policy, WCOE contacted representatives of the Central National Life Insurance Company, an Illinois corporation authorized to do business in New Mexico, which company will hereinafter be referred to as Central. Based on certain statistical information given Central, the latter offered to issue a group life insurance policy at a premium rate of 47¢ per $1,000 of life insurance per member per month. And the crux of this case is that the aforesaid "monthly premium rate [was] guaranteed for three (3) years."

Bids were submitted by several insurance companies, and WCOE finally narrowed the bids to those of Central and Safeco, the former's being the lowest offer. Safeco's was the next lowest bid at apparently either 52¢ or 55¢ per thousand per member per month, depending on the particular plan of insurance.

The plaintiffs eventually accepted the offer of Central and the latter issued its group policy to the eight locals who are the present plaintiffs, as well as to other locals who are not parties to the present proceeding. At the same time, the various locals began to pay the monthly premium rates called for by the policy.

Some eight months after the issuance of the policy, during which period of time Central accepted premiums from the various participating locals and in turn had been paying death claims, Central notified the plaintiffs in writing that the policy was being cancelled. The only reason given by Central for cancellation was that "since the Presidential wage freeze prevents us from increasing premiums, we have no other alternative other than to cancel the above contract, effective September 1, 1971." Although the foregoing was the only reason given for cancellation, the record reflects that the cancellation was precipitated by the fact that death benefits were far exceeding the premiums paid during the eight months the group policy was in effect.

Central's attempted cancellation of the group policy engendered the present dispute. Negotiations between the parties ensued. Out of these negotiations emerged a Memorandum of Understanding between Central and all of the locals which are plaintiffs in this case, except Local Number 953. Under the terms of this memorandum the locals, except for 953, agreed to pay a higher premium from October 1, 1971, till March 1, 1972, and in return Central agreed to process pending death claims. The memorandum, however, reserved to all parties their respective rights under the group life insurance policy.

Local Number 953, as indicated, did not sign the Memorandum of Understanding, and it immediately sought other insurance to replace the policy it had with Central. In this regard Local Number 953 thereafter entered into a contract with Hartford Life & Accident Insurance Company, effective October 15, 1971, the premium rate therefor being 70¢ per thousand per member per month. The other locals which are plaintiffs in the present case later entered into a contract with Safeco, effective March 1, 1972, which was the expiration date for the Memorandum of Understanding, the premium rate for such insurance being $1.00 per thousand per member per month.

It was in this setting that Local Number 953 brought the present case against

Central in the state courts of New Mexico, alleging that in cancelling the group policy Central breached the contract which called for a fixed premium rate for a three-year period. The case was later removed to the United States District Court for the District of New Mexico on the grounds of diversity. Seven other locals then sought to intervene as parties plaintiff and their respective motions to intervene were granted. The measure of damages sought was the difference between the premium rate agreed to by Central and guaranteed for three years and the cost of replacement insurance for the same three-year period of time. As indicated, in a trial to the court the judge found for the eight plaintiffs and awarded each its separate damages for the increased cost of replacement insurance. On appeal the central issue, as we see it, concerns the effect of a mistake made by an agent of Central in determining the 47¢ per thousand per member per month figure. We shall develop that phase of the controversy a bit.

Although Central realized throughout 1971 that its death benefits were exceeding its premiums, Central did not discover its own mistake till sometime in 1972. It did later develop, however, that the employee of Central who calculated the 47¢ premium rate had made a mathematical mistake in her computations, which resulted in the quoting of a lower premium rate than should have been the case. If the error in addition had not been made, the premium rate would have been 73½¢ per thousand per member per month. Additionally, it developed that the person who made the rate computation also did not get all of the statistical information from the plaintiffs necessary to make an actuarially sound computation.

It is Central's position in this court, as it was in the trial court, that it is entitled to equitable rescission because of the arithmetical mistake made by one of its employees in computing the premium rate on the group policy issued the plaintiffs. In support thereof, Central

first argues that the plaintiffs either knew, or should have known, of this mistake in computation and that the plaintiffs are now seeking to reap a profit from the mistake. In this particular connection we find it somewhat anomalous for Central to contend that the plaintiffs either knew, or should have known, of a mistake which Central did not itself discover for over a year. *Cf.* General Electric Supply Corp. v. Republic Const. Corp., 201 Or. 690, 272 P.2d 201 (1954). In any event, the trial court made a finding of fact that the plaintiffs did *not* know of Central's mistake, nor that they should have known, and such finding is supported by the record.

■ Admittedly Central's was the low bid, but, as indicated, Safeco's bid was either 52¢ or 55¢ per thousand and was described by one witness as being in the "same ball park." To make certain of Central's bid, the plaintiffs during the negotiations leading up to the issuance of the group policy insisted that an officer of Central be present at a subsequent meeting of the parties in order to verify the premium rate. This was done. Additionally, there was evidence that Central was trying to be the low bidder in order to gain the opportunity to perhaps sell additional insurance to other locals in the International Union which as of that time were not going to participate in the program. All things considered, the trial court's finding that the plaintiffs did not know of Central's mistake is certainly not clearly erroneous and on appeal such may not be disturbed by us.

On the question of mistake, Central additionally argues that even a so-called unilateral mistake may under certain circumstances be ground for rescission. It is true that the law on this point is perhaps not quite as harsh as it formerly was. In this connection, in 3 Corbin on Contracts § 606 (2d ed. 1960) appears the following comment:

"Relief for mistake depends, not only upon the materiality of the mistake, but also upon the stage in the

transaction at which the mistake is discovered and notice given. How far has performance already gone? To what extent and at what cost can the status quo ante be restored? What changes of position in reliance on the contract, by a party to it or by third parties, have occurred? * * *.

"It is often stated as a reason for denying relief that the mistaken party was negligent in making the mistake. A century ago it was often thought that in refusing relief it was sufficient to say that a man must bear the consequences of his own 'folly.' Court decisions now indicate that prevailing opinion is less harsh in its judgment of those who fail to act in accordance with some standard of care and prudence. We must still bear 'the consequences' of our own folly; but the court decisions have moderated some of those 'consequences.' They seem to justify the statement that one is held responsible for harm to others if it is caused by his 'folly' or his negligent mistake, but his responsibility need not be carried so far as to permit others to profit by reason of his mistake."

The parties to this controversy agree that the instant case is governed by Illinois law, and the law of that state would appear to be in general accord with the quotation from *Corbin*. For example, People ex rel. Dept. of Public Works & Buildings v. South East Nat'l Bank, 131 Ill.App.2d 238, 266 N.E.2d 778 (1971), is illustrative. In that case an engineering contractor made an arithmetical mistake in computing his bid on a public works project due to an inadvertently misplaced decimal point. The contractor caught his error and notified the state of the error and his desire to withdraw his bid. The state ignored this notification and proceeded to award him the job on his earlier bid. In such circumstance the contractor was held to have the right to rescind and in so holding that court declared as follows:

"The rule is often stated that relief will not be granted if but one party to

a contract has made a mistake. See, e. g. Restatement of the Law of Contracts, sec. 503; Restatement of the Law of Restitution, sec. 12. Professor Williston argues in his treatise on contracts that affirmative relief for a unilateral mistake is justified only where the mistake was known to the other party to the transaction or where the person against whom relief is sought is in the position of a donee or volunteer. Williston on Contracts (Rev. ed. 1937), Vol. V., secs. 1573, 1579. However, in numerous cases relief has been granted under less rigorous conditions (Annot. 59 A.L.R. 809; Corbin on Contracts, Vol. 3, secs. 608, 609) and the professor himself concedes that rescission should be allowed where a bid was predicated on erroneous arithmetical processes and the party not in error knew or should have known of the mistake. Williston on Contracts, Rev. ed., Vol. 5, sec. 1578.

"The conditions generally required for rescission are that the mistake relate to a material feature of the contract; that it occurred notwithstanding the exercise of reasonable care; that it is of such grave consequence that enforcement of the contract would be unconscionable, and that the other party can be placed in statu quo. Pomeroy's Equity Jurisprudence, Vol. 3 (5th ed. Symons 1941), sec. 870a; annot. 52 A.L.R.2d 792; 59 A.L.R. 809. Evidence of these conditions must be clear and positive. Winkelman v. Erwin, 333 Ill. 636, 165 N.E. 205 (1929)."

■ Applying the foregoing principles to the facts of the instant case, we hold that the trial court did not err in finding that the unilateral mistake on the part of Central did not justify rescission. The facts of the instant case do not meet the requirements necessary for rescission as set forth in the Illinois case cited above. Certainly, for example, the plaintiffs in accepting the low bid of Central have lost the opportunity to accept the next lowest bid of Safeco, and

it is difficult to see how the plaintiffs could at this late date be placed in status quo. Under the circumstances, then, this is not a case for rescission and Central must bear the consequences of its own folly.

■ Central advances numerous other grounds for reversal, many of which were not presented to the trial court and none of which merits extended comment. We are disinclined to consider those matters which were not presented to the trial court for its consideration and are raised for the first time either after trial or on appeal to this court. Ordinarily a defendant may not lose in a trial court on one set of defenses and then on appeal expect to win on another and different theory of defense. Eureka-Carlisle Company v. Rottman, 398 F.2d 1015 (10th Cir. 1968), and Schenfeld v. Norton Company, 391 F.2d 420 (10th Cir. 1968).

■ One argument which was presented to the trial court, and rejected by it, is that the group life insurance policy here involved is between Central and WCOE, and that the present plaintiffs, i. e., the eight local unions, not being parties to the contract, have no capacity to maintain the present action. This argument we believe to be specious. The policy itself refers to the "members" of WCOE, and the present plaintiffs are "members" of WCOE. All concerned understood that WCOE was acting at the behest of certain of its local unions who were desirous of getting a group life insurance policy. The monthly premiums for the eight months the policy was in effect were all paid for by the locals, not WCOE, and these premiums were accepted by Central. Furthermore, Central sent its notice of cancellation to the locals, not WCOE. Under such circumstances we agree with the determination of the trial court that the insurance contract was between Central and the locals. Assuming arguendo the validity of this particular argument, Central would then be faced with the re-lated doctrines of waiver and estoppel, which we need not here consider. Significantly, Central's overall position is weakened by the fact that in its cancellation notice it gave but *one* reason for cancellation, namely, that because of the Presidential freeze on prices it could not raise its premium rates. This reason is of course a non sequitur, since Central had agreed to the 47¢ per thousand rate for a term of three years.

Another matter submitted to the trial court was the contention of Central that the policy provisions required that at least 75% of the members of all locals having membership in WCOE be enrolled. In this regard Central states that in 1971 the total membership of all locals belonging to WCOE was approximately 108,000, and that only 72,528 members obtained coverage under Central's group policy, which is less than the required 75%.

■ As concerns the 75% requirement, the plaintiffs contend that this simply meant that 75% of the members of those locals which subscribed to the group policy must enroll and that 75% of the members of those locals subscribing to the policy did in fact enroll. The trial court found the 75% requirement to be ambiguous and agreed with the plaintiffs that it was the intent of the parties that the provision in question only required that 75% of the members of those locals which elected to come under the group policy be enrolled. This finding is supported by substantial evidence and is not clearly erroneous, and should therefore not be disturbed by us. Certainly all parties knew that there were many locals in WCOE which were satisfied with the insurance they then had, and were not interested in Central's offer. Central's acceptance of premiums without questioning the enrollment percentage is certainly in accord with the trial court's interpretation of the policy. And again, if the argument itself had intrinsic merit, Central would be subject to the defenses of waiver and estoppel.

■ Central also complains that the trial court erred in its measure of damages, which, as indicated, was the difference between the premium rate guaranteed by Central for a term of three years and the cost of replacement insurance of a similar quality for a three-year term. Central states that the measure of damages should have been the difference between what its premium rate would have been, but for the arithmetical error, and cost of replacement error. For reasons set forth above, Central should not be permitted to thus benefit from its own error. The measure of damages used by the trial court would seem to be in accord with the general rule as set forth in 20 J. Appleman, Insurance Law & Practice § 11255 (2d ed. 1963):

> "The safest general rule adopted by the courts is that the measure of damages is the value of the policy at the time of breach. If the insured can secure insurance of a like character and value to that cancelled, the difference between the cost of carrying the cancelled insurance for the term stipulated and the cost of new insurance for a like term would be his measure of damages."

■ There is also minor complaint that the plaintiffs failed to mitigate their damage in that they failed to find replacement insurance the cost of which more nearly approximated the mistaken bid of Central. There is nothing in the record to substantiate this argument. Many new factors entered into the cost of the replacement insurance, including the fact that the present dispute between Central and the locals became generally known in the insurance industry and resulted in some very careful computation of the premium rates for the replacement insurance.

Local 701 of the International Union brought a similar action against Central in the state courts of Oregon based on about the same sequence of facts as the present proceeding and involving the same group policy. In that case, as here, the local prevailed and Central appealed. On appeal the Oregon Supreme Court affirmed and their disposition of the matter parallels ours. *See* International Union of Operating Engineers, Local 701 v. Central National Life Insurance Company, 519 P.2d 85 (Or.1974).

Judgment affirmed.