**CITY OF FARMINGTON,**
**Plaintiff-Appellee,**

v.

**AMOCO GAS COMPANY,**
**Defendant-Appellant.**

**No. 83–2523.**

United States Court of Appeals,
Tenth Circuit.

Nov. 12, 1985.

J. Paul Douglas, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C. (Edward B. Hinders, Amoco Gas Co., Houston, Tex., and Kemp W. Gorthey, Austin, Tex., with him on briefs), for defendant-appellant.

Charles F. Wheatley, Jr., Wheatley & Wollesen, Washington, D.C. (Michael J. Thompson, Wheatley & Wollesen, Washington, D.C., and Dwight D. Arthur, City

Atty., City of Farmington, N.M., with him on brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, MOORE, Circuit Judge, and THOMPSON, District Judge.*

JOHN P. MOORE, Circuit Judge.

Appellant, Amoco Gas Company (Amoco), appeals from a judgment entered by the United States District Court for the District of New Mexico in favor of appellee, the City of Farmington (Farmington). *City of Farmington v. Amoco Gas Co.,* 568 F.Supp. 1265 (D.N.M.1983). The controversy between the parties arose out of a long-term contract for the intrastate sale of natural gas by Amoco to Farmington. Claiming that Amoco breached the contract, Farmington filed suit, seeking damages for alleged overcharges from June 21, 1974, through October 1, 1981, the contract termination date. Amoco denied the overcharges and filed a counterclaim for alleged undercharges to Farmington. After a bench trial, the district court allowed the charges claimed by Amoco from June 21, 1974, through July 26, 1976, awarding Amoco damages plus interest on its counterclaim. For July 27, 1976, to October 1, 1981, the district court held that, under the terms of the contract, Amoco overcharged Farmington. On appeal, Amoco challenges the court's finding of overcharges, its corresponding judgment in favor of Farmington for damages, and its award of prejudgment interest to Farmington.[1] Because Amoco failed to establish that the district court's interpretation of the contract was clearly erroneous or that its award of prejudgment interest was an abuse of discretion, we affirm.

On September 28, 1961, Amoco and Farmington entered into an agreement entitled "Industrial Gas Sales Contract" in which Amoco agreed to sell and distribute, and Farmington agreed to purchase, certain quantities of natural gas. The contract contemplated an intrastate sale of gas produced in the San Juan Basin Area of New Mexico which was to be used solely in Farmington's electric generating plant.[2] On September 15, 1971, the parties executed an amendment to the contract covering the period October 1, 1971, through October 1, 1981. Among other changes and additions to the contract, the 1971 amendment included the following pricing provision, known as ¶ B:

> B. Commencing October 1, 1972, and thereafter to October 1, 1981, the price per MMBtu specified in Paragraph A above shall be increased but not decreased from time to time to maintain a

---

* Honorable Ralph G. Thompson, United States District Court for the Western District of Oklahoma, sitting by designation.

1. In its briefs and at oral argument, Amoco also contended that the district court erred in refusing to make its denial of gathering allowances requested by Amoco contingent upon a final decision in *Texas Eastern Transmission Corp. v. Federal Energy Regulatory Comm'n,* pending before the United States Court of Appeals for the Fifth Circuit. At issue in that case were Commission regulations governing the collection of production-related allowances, including the gathering allowances claimed by Amoco, which were established in Delivery Allowances Under Section 110 of the Natural Gas Policy Act of 1978, 48 Fed.Reg. 5180, 5182–5186, 5190 (1983) (18 C.F.R. § 271.1104) (1985). In this case, the district court based its denial of retroactive collection of gathering allowances by Amoco on the Commission's specific disallowance of those charges for intrastate deliveries of gas occurring prior to March 7, 1983.

On August 19, 1985, following oral argument in the instant case, the Fifth Circuit issued its decision in *Texas Eastern* in which it affirmed the March 7, 1983, date for the collection of production-related allowances under intrastate contracts for the sale of gas. *Texas Eastern Transmission Corp. v. Federal Energy Regulatory Comm'n,* 769 F.2d 1053 (5th Cir.1985). Thereafter, Amoco notified this court that it wished to withdraw its argument regarding gathering allowances because the *Texas Eastern* decision mooted that argument. Accordingly, we do not address the issue of gathering allowances in this opinion.

2. The district court found that "[t]he parties took great pains in their original 1961 contract and the 1971 amendment to ensure that this was an intrastate sale of gas not subject to the [Federal Power] Commission's jurisdiction." *City of Farmington, supra,* at 1269.

minimum price differential of [1.5 cents] in relation to and higher than the then current Federal Power Commission (FPC) area price in cents per MCF for gas of this contract vintage and same quality as sold in the San Juan Basin Area as set forth by the FPC consisting of San Juan, Rio Arriba, McKinley, and Sandoval Counties, New Mexico; and Montezuma, La Plata, Archuleta, Mineral, Hinsdale, San Juan, Dolores, San Miguel, Ouray and Montrose Counties, Colorado. As used herein, the term "contract vintage" shall mean contracts entered into after June 17, 1970, and before October 1, 1973. Accordingly, should the FPC, or any successor governmental authority having similar jurisdiction, allow, by order following hearing, or by settlement, for the San Juan Basin Area a just and reasonable area price higher than [24.0 cents] per MCF for gas of this contract vintage, then the price to be paid by Buyer to Seller for gas under this contract shall be increased as hereinabove provided to be effective on the date such order is issued or settlement agreement approved by the Commission.

The parties agree that ¶ B is an indefinite price escalator clause, a provision which permits "upward price adjustments on the occurrence of some specified triggering event." *Pennzoil Co. v. Federal Energy Regulatory Commission*, 645 F.2d 360, 366 (5th Cir.1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). More specifically, the parties characterize ¶ B as an "area rate clause," a form of indefinite price escalator clause which "authorizes an escalation in the contract price whenever there is an increase in the applicable just and reasonable wellhead ceiling price for the category of gas involved." *Id.* note 1, at 365. In this case, the area rate clause tied increases in the contract price to adjustments by the FPC (or its successor) in the allowable price for San Juan Basin Area gas sold under interstate contracts of a defined contract vintage. The operation of the clause following several unanticipated changes in the pricing mechanism employed by the FPC and its successor,[3] is the source of the current controversy between Amoco and Farmington.

The precise problem presented in this case is the operation of the contract vintage pricing mechanism introduced by the parties in the 1971 amendment in the context of regulatory pricing actions which ultimately abandoned contract vintaging for other vintaging criteria, such as well commencement date or date of dedication of gas to interstate commerce. In executing the 1971 amendment, the parties embraced the vintaging concept then used by the FPC. The district court found that "[t]he parties obviously drafted ¶ B with an eye to Order 435," which was issued by the FPC two months prior to the execution of the 1971 amendment.[4] *City of Farmington, supra,* at 1267. Order No. 435 prescribed an initial price, or area rate, of 24 cents per thousand cubic feet (MCF) for interstate sales of gas from the San Juan Basin Area for contracts dated on or after June 17, 1970. In selecting contract date as the triggering mechanism for application of the initial rates, the FPC established contract vintaging as the scheme for dividing "new" oil prices from "old" oil prices.[5]

---

**3.** On October 1, 1977, pursuant to the Department of Energy Organization Act, § 402(a), 42 U.S.C.A. § 7172(a), and Executive Order No. 12009, 42 Fed.Reg. 46267 (1977), the Federal Energy Regulatory Commission (FERC) took over the functions of the FPC.

**4.** Initial Rates for Future Sales of Natural Gas for all Areas, Order No. 435, 46 F.P.C. 68 (1971), *amended,* 46 F.P.C. 620 (1971), *aff'd sub nom. American Pub. Gas Ass'n v. Federal Power Comm'n,* 498 F.2d 718 (D.C.Cir.1974). In concluding that ¶ B tracked the language and concepts embodied in Order No. 435, the district

court noted that ¶ B established the same initial price of 24 cents per MCF, the identical definition of the San Juan Basin Area, and the same contract vintage date of June 17, 1970, as established by the FPC in Order No. 435.

**5.** New oil prices reflect, among other things, increased production costs. A division between new and old oil prices was necessary, in the face of rapidly increasing demand for gas, to provide incentive for the exploration and drilling of new oil reserves. *American Pub. Gas Ass'n v. Federal Power Comm'n,* 498 F.2d 718 (D.C.Cir.1974).

The district court found that the parties intended to incorporate the concept of contract vintaging as then practiced by the FPC into their price escalation clause. It went on to conclude: "[t]he parties undoubtedly anticipated that the FPC would continue to prescribe area rates solely by looking to the date on the face of a contract and that at some time in the future the FPC would issue an order establishing a new dividing date between 'old' gas and 'new' gas."[6] *Id.*

Dispute over the operation of the indefinite price escalator clause in ¶ B first arose when the FPC issued Opinion Nos. 699, 699–A, and 699–H in 1974.[7] With this opinion series, the FPC abandoned its approach of prescribing rates for particular production areas and adopted instead generally applicable nationwide rates. *Pennzoil, supra,* at 367. The series also implemented a change from contract vintaging to vintaging determined, in part, by well commence-

ment date.[8] Based on its determination that the opinions triggered the indefinite price escalator clause, Amoco charged Farmington 43.5 cents per MCF under Opinion Nos. 699 and 699–A (for the period June 24, 1974, to December 4, 1974) and 51.5 cents per MCF under Opinion No. 699–H (December 4, 1974, to August 1, 1976).[9] Farmington paid those rates under protest. After determining that the gas sold under the contract qualified for the 699 series prices because contracts executed between January 1, 1973, and October 1, 1973, the third category of eligibility under 699–H, fell within the contract vintage period defined in ¶ B, the district court found that Amoco had undercharged Farmington. Accordingly, it awarded Amoco damages on its counterclaim which reflected the amount of the undercharges.[10] Farmington does not appeal that determination.

In 1976, the FPC issued Opinion Nos. 770

**6.** The district court elaborated that if the FPC had chosen a new dividing date for old and new gas that was before October 1, 1973, the ending date for the contract vintage defined in ¶ B, Amoco would receive the new oil price for gas sold under the contract. If the date chosen was subsequent to October 1, 1973, gas sold under the contract would be old gas, not eligible for the new gas price prescribed by the FPC.

**7.** Just and Reasonable National Rates for Sales of Natural Gas, Opinion No. 699–H, 52 F.P.C. 1604 (1974), *aff'g and modifying* Opinion No. 699, 51 F.P.C. 2212 (1974), and Opinion No. 699–A, 52 F.P.C. 263 (1974), *aff'd sub nom. Shell Oil Co. v. Federal Power Comm'n,* 520 F.2d 1061 (5th Cir.1975), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976).

**8.** Opinion No. 699 established a national base rate of 42 cents per MCF for the following categories of gas:

[S]ales of natural gas in interstate commerce made[:]

[i] from wells commenced on or after January 1, 1973; or

[ii] pursuant to contracts executed on or after January 1, 1973, for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce except pursuant to the provisions of 18 CFR §§ 2.68, 2.70, 157.22, or 157.29 (including sales made pursuant to those sections as modified by Order No. 491); or

[iii] pursuant to contracts executed on or after January 1, 1973, where the sales were formerly made pursuant to permanent certificates of unlimited duration under contracts which expired by their own terms on or after January 1, 1973....

Opinion No. 699–A revised the second category [ii] of 699, substituting "sales initiated on or after January 1, 1973," for the words "contracts executed."

Opinion 699–H increased the base national rate to 50 cents per MCF and revised the third category [iii] of 699 and 699–A to read:

Sales made pursuant to contracts executed prior to or subsequent to the expiration of the term of the prior contract where the sales were formerly made pursuant to permanent certificates of unlimited duration under such prior contracts which expired of their own terms on or after January 1, 1973, or pursuant to contracts executed on or after January 1, 1973, where the prior contract expired by its own terms prior to January 1, 1973.

**9.** The rates charged by Amoco included the 1.5-cent differential provided in ¶ B.

**10.** The court found that Amoco was entitled to collect a 50-cent base rate from June 21, 1974, to August 27, 1975. From August 28, 1975, through July 26, 1976, the court held Amoco was entitled to collect a base rate of 50 cents times a small producer differential of 130%. Amoco's entitlement to the small producer differential is not raised as an issue in this appeal.

and 770–A,[11] which established a national rate of $1.42 for gas from wells commenced after December 31, 1974, and $0.93 for gas sold from wells commenced after December 31, 1972. The rate for certain gas not qualifying under the well commencement criteria was limited to 52 cents per MCF: 1) gas from wells commenced prior to January 1, 1973, which was first dedicated to interstate commerce on or after January 1, 1973; and 2) gas sold under replacement contracts executed on or after January 1, 1973.[12] For gas delivered between August 1, 1976, and April 1, 1980, Amoco charged Farmington 94.5 cents per MCF (93 cents plus the 1.5-cent differential in ¶ B). Subsequently, Amoco counterclaimed for the difference between the amounts charged and the base price of $1.42 for that period. The district court denied the counterclaim and further held that Amoco was only entitled to the 52-cent base rate (times the 130% small producer differential), rather than the 93-cent base rate charged. While recognizing that the FPC's alteration of its vintaging practices prevented precise correlation of ¶ B with Opinion No. 770–A, the court found that the categories of gas to which the 52-cent rate applied, gas sold pursuant to replacement contracts executed on or after January 1, 1973, and new dedications of gas

where sales were initiated on or after January 1, 1973, most closely approximated contract vintage as defined in ¶ B. The court concluded that its approach effectuated the parties' intent to tie increases in price to FPC price increases for gas of the defined contract vintage. Amoco appeals this determination.

The final change in natural gas pricing with implications for the current controversy occurred on November 9, 1978, with the passage of the Natural Gas Policy Act, 15 U.S.C. § 3301, *et seq.*, (the NGPA), which established maximum lawful national prices for interstate and intrastate sales of natural gas.[13] Section 105(b) of the NGPA (15 U.S.C. § 3315(b)), "Ceiling price for sales under existing intrastate contracts," set the maximum lawful price as the lower of:

(A) the price under the terms of the existing contract to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month under section 3312 [§ 102 of the NGPA] of this title (relating to new natural gas).

Amoco did not increase its prices based upon § 105 until April 1, 1981. From April

---

**11.** National Rates for Jurisdictional Sales of Natural Gas, Opinion No. 770, 56 F.P.C. 509, *reh. denied;* Opinion No. 770–A, 56 F.P.C. 2698 (1976), *aff'd sub nom. American Pub. Gas Ass'n v. Federal Power Comm'n,* 567 F.2d 1016 (D.C. Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

**12.** Opinion No. 770–A, effective July 27, 1976, provided the following base rates:

A. $1.42 per MCF where "[t]he sale is made from a well commenced on or after January 1, 1975."

B. $0.93 per MCF where "[t]he sale is made from a well commenced on or after January 1, 1973, and prior to January 1, 1975."

C. $0.52 per MCF for:

Sales ... made pursuant to (A) a replacement contract where the sale was formerly made pursuant to a permanent certificate of unlimited duration under such prior contract which expired by its own term on or after January 1, 1973, or pursuant to a contract executed on or after January 1, 1973, where the prior con-

tract expired by its own terms prior to January 1, 1973; or (B) contracts for sale of natural gas in interstate commerce for gas from wells commenced prior to January 1, 1973, and not previously sold in interstate commerce prior to January 1, 1973, except pursuant to the provisions of §§ 2.68, 2.70, 157.22 or 157.29 (including sales made pursuant to those sections as modified by Federal Power Commission Order No. 491, *et al.*); or (C) a completion operation into a different formerly nonproductive reservoir commenced on or after January 1, 1973, in a well commenced (spudded) prior to January 1, 1973.

**13.** In establishing maximum lawful prices for natural gas sales, Congress reassumed the rulemaking authority previously delegated to the FPC (and its successor, FERC). The district court found, over Farmington's objections, that Congress was a "successor governmental authority" within the meaning of ¶ B. *City of Farmington, supra,* at 1273. Farmington does not appeal that finding.

1, 1981, through October 1, 1981, Amoco collected the § 102 price. In its counterclaim, Amoco sought the difference between the prices it collected and the § 102 price for the entire period from December 1, 1978, through October 1, 1981. After determining that the price under ¶ B on November 9, 1978, which was 52 cents per MCF (times a small producer differential and adjusted by a monthly inflation factor prescribed by § 101 of the NGPA), was lower than the § 102 price applicable at that time, the district court determined that § 105 required application of the 52-cent rate for the period December 1, 1978, through October 1, 1981.[14] Amoco appeals this determination.

## I

■ At the outset, we note that despite Amoco's assertions regarding "the clear, unambiguous language of ¶ B," the amendment to the parties' contract cannot be regarded as unambiguous, particularly when viewed in the context of changed regulatory circumstances.[15] As the court in *Pennzoil, supra,* stated:

> [A]mbiguity often arises from the application of the contract to the subject matter of the agreement, and extrinsic evidence is admissible to remove and explain any ambiguity in the contract as applied. *Sunbury Textile Mills, Inc. v. C.I.R.,* 585 F.2d 1190, 1196 (3d Cir.1978). Ambiguity easily arises when the contract is applied to its subject matter in changed circumstances. Area rate clauses are certainly ambiguous as applied to

the collection of currently available ceiling rates for natural gas. A contract should be interpreted in light of changed circumstances to accomplish what the parties intended. *See Richmond Power & Light v. FPC,* 481 F.2d 490, 499 (D.C. Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).

*Pennzoil, supra,* at 388.

Therefore, the district court properly looked at extrinsic evidence, such as Order No. 435 and other indicia of the setting in which ¶ B was executed, in determining the parties' intent in the several instances in which Amoco claimed that the pricing mechanism in ¶ B was triggered to produce a price increase.

■ Once it is determined that a contract is ambiguous and that its construction depends on extrinsic circumstances, interpretation of the contract becomes a question of fact. *Amoco Production Co. v. Western Slope Gas Co.,* 754 F.2d 303, 309 (10th Cir.1985); *Jaeco Pump Co. v. Inject-O-Meter Manufacturing Co.,* 467 F.2d 317, 320 (10th Cir.1972); *Metropolitan Paving Co. v. City of Aurora,* 449 F.2d 177, 181 (10th Cir.1971). Findings of fact by a district court will not be set aside unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City, N.C.,* — U.S. —, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Amoco Production Co., supra,* at 309; *Volis v. Puritan Life Insurance Co.,* 548 F.2d 895, 901 (10th Cir.1977). Therefore, we will reverse the

---

**14.** In making its determination that the 52-cent rate applied, the district court also rejected Amoco's alternative argument that it should receive the § 108 price, "Ceiling price for stripper well natural gas," because some of the gas sold to Farmington qualified under the definition of stripper well gas. Amoco does not raise the issue of its entitlement to the § 108 rate on appeal.

**15.** The district court found that deciding the "determinative issue" of the intent of the parties required it "to consider the language of the contract, its purposes, and the circumstances of its execution, i.e. its commercial and regulatory context. *Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360, 388 (5th Cir.

1981)." *City of Farmington, supra,* at 1267. We have recognized that:

> "[t]he court should, as far as possible, place itself in the position of the parties at the time of its execution, and then, from a consideration of the instrument itself, its purposes, and the circumstances surrounding its execution, ascertain the intention of the parties...."

*United States v. Essley,* 10th Cir., 1960, 284 F.2d 518, 520.

*Tenneco Oil v. Gaffney,* 369 F.2d 306, 308 (10th Cir.1966). Where "the intent of the parties cannot be determined from the contract itself, then other evidence must be considered." *Superior Oil v. Western Slope Gas Co.,* 604 F.2d 1281, 1289 (10th Cir.1979).

district court's interpretation of the operation of ¶ B in the context of the regulatory changes established by Opinion Nos. 770 and 770–A and the NGPA "only if our review of the record leaves us with a definite and firm conviction that a mistake has been made." *Amoco Production Co., supra,* at 309. *See also Dowell v. United States,* 553 F.2d 1233, 1235 (10th Cir.1977); *Davis Cattle Co. v. Great Western Sugar Co.,* 544 F.2d 436, 439 (10th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 514 (1977). Because our review of the record leads us to the conclusion that the district court's findings were not clearly erroneous, we affirm its judgment in favor of Farmington.

A

■ On appeal, Amoco contends it was entitled to collect the 93-cent rate prescribed in Opinion No. 770–A for gas wells commenced after December 31, 1972. Amoco makes several alternative arguments in attempting to demonstrate the district court's error in limiting Amoco to 52 cents per MCF for the period July 27, 1976, through November 30, 1978. None of the arguments compel the conclusion that the district court erred in its interpretation of the contract.

Amoco first argues that the district court's application of the 52-cent rate under Opinion Nos. 770 and 770–A is inconsistent with its earlier finding that the parties did not intend to limit the contract price under ¶ B to rates which could have been charged for the gas had it been sold in interstate commerce.[16] Amoco reasons that, in selecting the rate applicable to interstate sales of gas sold pursuant to contracts executed on or after January 1, 1973, the district court "necessarily held that Amoco Gas was limited to prices which could have been charged if the gas had been sold in

interstate commerce." The conflict within its opinion, Amoco argues, demonstrates the error in the court's denial of the 93-cent rate claimed by Amoco. We disagree.

Amoco entirely distorts the district court's approach to the interpretation of ¶ B in light of the FPC's Opinion No. 770 series change in vintaging practice. In deciding the 52-cent rate applied, the court did not ignore or abandon its earlier finding that the FPC's rate opinions were intended to serve only as guidelines for establishing the price under the contract. It attempted, as it had when it allowed Amoco the rate it requested under the series 699 opinions, to select a category of gas prescribed by the FPC which most closely approximated the contract vintaging concept adopted in ¶ B. In thus effectuating the parties' intent, the court did not apply all of the criteria established for an interstate sale of gas of that category. The court's selection of a rate which also applied to interstate sales of gas was a natural and obvious consequence of the parties' adoption of FPC rate opinions as guidelines for price setting. We find no inconsistency within the court's opinion and, therefore, no foundation for Amoco's first argument in support of its entitlement to the 93-cent rate.

Amoco next contends, in selecting the replacement contract date-based category associated with the 52-cent rate as most closely approximating the ¶ B concept of contract vintaging, the district court misinterpreted the nature of the changes made by the FPC in vintaging practices in Opinion Nos. 770 and 770–A and, consequently, erroneously denied Amoco the 93-cent rate to which it was entitled. Amoco maintains that Opinion No. 770–A established the date of well commencement as the *sole* criterion for differentiating among different rates. When the indefinite price escalator clause with its defined contract vintage

---

**16.** In this context, the district court found the parties did not intend that the sale of gas under their contract meet each of the criteria set out by the FPC in connection with an established rate in order for that rate to apply to their transaction. The court stated: "The parties intended the Commission rate opinions to be used

merely as a gauge for setting the price under the contract; nowhere on its face does the contract indicate that all the terms and conditions of the Commission's rate opinions were intended to apply to the Amoco-Farmington sale." *City of Farmington, supra,* at 1269.

period of June 17, 1970, to October 1, 1973, is viewed in light of the "dramatically altered ... vintaging practices," Amoco reasons that the applicable rate under ¶ B is the highest rate provided for wells commenced during the contract vintage period. The 93-cent rate, the highest rate permitted for wells commenced between January 1, 1973, and October 1, 1973, was therefore applicable to sales of gas under the parties' contract.

Amoco's argument essentially substitutes well commencement date for the contract vintage concept adopted in ¶ B. We agree with the district court's finding that there is no justification for the transformation of the contract vintage period into a period defined by well commencement vintage because there is no correlation between the two vintaging concepts. The district court correctly analyzed Amoco's argument when it stated:

> This construction fails to give effect to the parties' intention to incorporate vintaging into the escalation clause; although it gives lip service to the contract definition of "contract vintage" by looking to the price collected under other contracts dated between June 17, 1970 and October 1, 1973, it ignores entirely the fact that this definition was intended to correspond to a vintage of gas and not just *any* gas.

*City of Farmington, supra,* at 1271 (emphasis supplied). Like the district court, we find no indication in the language of ¶ B or in the circumstances surrounding its execution that the parties intended to increase their contract price whenever the FPC increased the permissible rates for any gas from the San Juan Basin Area.

Alternatively, Amoco argues that application of the 93-cent rate is appropriate as a modification of the initial rate of 24 cents prescribed by Order No. 435 and adopted by ¶ B. Amoco reasons that, because some of the gas which initially sold for 24 cents under Order No. 435 could have later been sold at the 93-cent rate (as long as the well commencement criteria of Opinion No. 770–A were fulfilled), the 93-cent rate was

merely an extension of the initial rate appropriately charged under the contract. Once again, Amoco's argument ignores the fact that increases in contract price were specifically tied to the contract vintage period incorporated into the ¶ B indefinite price escalator clause. There is no basis for Amoco's attempt to rewrite the contract pricing mechanism in this manner.

Amoco has not demonstrated that the district court's interpretation of ¶ B to require application of the 52-cent per MCF rate prescribed by Opinion No. 770–A is clearly erroneous. We therefore affirm its determination and its corresponding award of damages to Farmington based on the difference between the 52-cent rate and the amounts actually collected by Amoco.

### B

With respect to the NGPA, the parties agree that § 105(b)(1) prescribes the maximum lawful price for the sale of gas under the contract. On appeal, Amoco claims the district court erroneously found the 52-cent rate to be applicable as a result of its faulty reading of § 105(b)(1) as limiting the ceiling price for intrastate sales to the lower of the "contract price" on November 9, 1978 or the § 102 price. Amoco points out that § 105(b)(1) does not use the words "contract price" but instead speaks specifically of "the price under the terms of the existing contract," a phrase which differs significantly from the NGPA definition of contract price as "the price paid per million Btu's, under a contract for deliveries of gas occurring on ... [a specific] date." (*See* § 105(c).) Because the legislative history demonstrates that "price under the terms of the existing contract" was included in the NGPA to permit increases in price according to the intended operation of the contract and to avoid freezing contract prices as they existed on November 9, 1978, Amoco argues the district court erred in limiting Amoco to 52 cents, the contract price for that date. In concluding that the price could not go above that rate, Amoco contends the district court did not permit the indefinite price escalator clause to oper-

ate according to its terms as required by § 105(b)(1).

Once again, Amoco misconstrues the approach taken by the district court in its interpretation of ¶ B. Through semantic legerdemain exercised in the comparison of the words "contract price" with the phrase, "price under the terms of the existing contract," Amoco attempts to demonstrate the district court's failure to give effect to the indefinite price escalator clause in ¶ B. The infirmity in its argument is evident when the entire sentence in the district court's opinion from which Amoco extracted the words "contract price" is examined. That sentence reads: "Since § 105 provides that the maximum lawful price is the lower of the contract price on November 9, 1978 or the § 102 price, it is necessary first to determine *the price under ¶ B* on November 9, 1978." *City of Farmington, supra,* at 1273 (emphasis added). The district court then went on to determine that price, giving full effect to the terms of the indefinite price escalator clause in ¶ B.

The district court looked first to § 104 of the NGPA (15 U.S.C. § 3314), "Ceiling price for sales of natural gas dedicated to interstate commerce," which became effective on November 9, 1978, to determine the just and reasonable area price prescribed by a governmental authority, as required by ¶ B.[17] It ascertained that § 104 made area and national rates existing on November 8, 1978, effective under the NGPA on November 9, 1978, while adding an inflation factor provided in § 101 of the NGPA (15 U.S.C. § 1311). As previously determined by the district court, Opinion No. 770–A prescribed a rate of 52 cents per MCF for the period ending November 8, 1978, for sales under the parties' contract. After applying the § 101 inflation factor to the 52-cent rate, the court determined that the resulting rate for November 9, 1978, was lower than the § 102 rate applicable at the time. In accordance with § 105(b)(1), the court then decided that Amoco was limited to the 52-cent rate under the NGPA.

The foregoing examination of the district court's analysis reveals that it properly determined the November 9, 1978, price under the parties' contract as required by ¶ B, and it did not merely freeze the contract price paid on that date, as Amoco contends. The court's reference to the "contract price" on November 9, 1978, was merely a reflection of the obvious consequence that once the terms of the contract are applied to ascertain the price on a particular date, the determined price becomes the "contract price" for that date. Because the court properly applied the terms of ¶ B to determine the November 9, 1978, contract price, Amoco's attempts to draw distinctions between "contract price" and "price under the terms of the existing contract" are irrelevant.

In support of its claim of entitlement to the § 102 price, Amoco also cites *Pennzoil, supra,* for the proposition that the NGPA permits area rate clauses to escalate contract prices up to the maximum lawful prices provided in the statute. Amoco points out that under § 105(b)(1), which governs all intrastate contracts in existence on November 9, 1978, the § 102 price is a rate for gas of the appropriate vintage under ¶ B because it was established as a maximum for gas sold pursuant to contracts dated after June 17, 1970, and before October 1, 1973. Therefore, Amoco concludes it is entitled to collect the § 102 price for the period covered by the NGPA.

With regard to *Pennzoil,* we first note that while the case holds the NGPA permits escalation of contract prices to statutory maximum lawful prices, it also holds that the NGPA does not *require* such escalation. *Id.* at 372. *See also Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 709, 74 L.Ed.2d 569 (1983). Amoco recognizes,

17. In looking to § 104 rates for gas sold in interstate commerce, the district court fulfilled the parties' intent that rates prescribed by the FPC or a successor governmental authority for interstate sales of gas from the San Juan Basin Area be used as guidelines for setting prices under the contract.

and we agree, that under *Pennzoil* the contract price may escalate up to the NGPA ceiling price only if a price escalation mechanism in the contract provides for such increases: "the statute's operation is limited to keeping sales prices from exceeding the ceiling, therefore contractual authority is required to collect permissible rates...." *Pennzoil, supra,* at 374.

The district court fully recognized that the contractual arrangement continues to govern the contract price subject to the applicable ceiling when it found the parties' contract did not contain a sufficient escalation mechanism to permit Amoco to collect the § 102 price. However, Amoco now takes issue with this finding, contending it was supported only by the statement that the parties did not intend to allow Amoco [Gas] to charge the highest lawful price for any gas that is sold pursuant to contracts of the appropriate date. *City of Farmington, supra,* at 1273. Amoco argues the district court failed to properly scrutinize the precise meaning of the words included by the parties in the ¶ B price escalator clause. Amoco dwells at length on the word "allow,"[18] contending that, had the district court attached the proper meaning of "permit, approve of, or fix," it would have concluded the clause provided for escalation of the contract price up to the § 102 price. Amoco reasons:

> Because the Section 102 price is the level to which indefinite pricing clauses are "allowed" or "permitted" to escalate the price under the terms of the contract under Section 105(b)(1), and because Paragraph B states the price will be escalated to any higher level allowed by a

successor governmental authority (*i.e.,* Congress), it follows that Paragraph B authorized Amoco Gas to collect any price up to the Section 102 price.

We disagree.

Amoco's conclusion is based on the faulty premise that ¶ B permits the contract price to rise to *any* higher level allowed by the FPC or a successor governmental authority, a proposition unsupported by the language of ¶ B or evidence of the parties' intent. The proposition suffers from the same deficiencies as Amoco's arguments in support of its claim for the highest rates permitted by Opinion No. 770–A. The operation of the indefinite price escalator clause is specifically tied to the establishment of "a just and reasonable area price" for a specific category of gas— gas of the defined contract vintage. Permitting price escalation upon the establishment of a new ceiling price for any gas in the area, as Amoco's proposition asserts, ignores the language of ¶ B. Therefore, Amoco's claim of entitlement to the § 102 price must fail.

As an alternative to the § 102 price, Amoco argues that ¶ B authorizes it to collect the § 103 price, "Ceiling price for new, onshore production wells," (15 U.S.C. § 3313) because some of the gas sold to Farmington was produced from wells qualifying under this section.[19] Section 103 governs the sale of gas from wells where surface drilling began on or after February 19, 1977. Amoco argues that the drilling date constitutes a vintage condition. Because § 103 applies to contracts of all dates (as long as the drilling vintage condition is met), Amoco reasons that gas qualifying

18. Amoco analyzes this word in the context of ¶ B: "Accordingly, should the FPC, or any successor governmental authority having similar jurisdiction, *allow,* by order following hearing, or by settlement, for the San Juan Basin Area, a just and reasonable area price higher than [24.0 cents] per MCF...." (Emphasis added.)

19. Farmington argues that this court should not address the issue of Amoco's entitlement to the § 103 price because Amoco raises for the first time on appeal the theory of its claim to that price for *all* the gas sold to Farmington during a certain period. The district court addressed the

issue of collection of the §§ 103 and 108 prices for gas which independently qualified under those sections in a separate memorandum opinion, *City of Farmington v. Amoco Gas Co.,* No. 81–0360 HB (D.N.M. June 23, 1983), which was incorporated into the court's final judgment of October 25, 1983. While the issue of collection of the § 103 price for all the gas sold during a certain period is broader than the issue decided by the district court, the underlying arguments are similar. We therefore address the broader issue in this opinion.

under § 103 meets any possible vintaging condition, including the vintage concept in ¶ B. Amoco concludes that, because the district court found the parties intended to set one price for gas sold under their contract during any period of time, it was entitled to collect the § 103 price for all gas sold to Farmington following the effective date of § 103.

Amoco's argument suffers the same infirmities as the substantially similar argument it advanced in support of its entitlement to the Opinion No. 770–A rate of 93 cents per MCF based on well commencement date. While the drilling date in § 103 is undeniably a date describing a vintage of gas, it has no conceivable relationship to the contract vintaging concept embraced by the parties in ¶ B. As we stated earlier, there is no justification for replacing contract vintage with an entirely different vintage mechanism.

Assuming this court denies Amoco the § 103 price for all gas sold to Farmington from June 1, 1981, through October 1, 1981, Amoco argues it should be permitted to collect the § 103 price for the gas which independently qualified under that section. Despite the district court's conclusion that ¶ B "provided that all the gas would be paid for at the same rate," *City of Farmington v. Amoco Gas Co.*, No. 81–0360 HB, slip op. at 1 (D.N.M. June 23, 1983), Amoco now contends that ¶ B permits the collection of different rates because the FPC "[i]n 1971, in some areas, ... permitted producers to sell gas from reservoirs discovered on or after the dividing date between 'old' and 'new' contracts at the area rate for gas sold pursuant to 'new' contracts even though the gas was sold pursuant to an old contract." However, there is no indication that the parties executed ¶ B

with an eye to this FPC practice. Furthermore, collection of a rate based on qualification by date of well drilling entirely ignores the contract vintage language of ¶ B. Therefore, we conclude that Amoco was not entitled to collect the § 103 rate.

Based on the foregoing, we affirm the district court's finding that the 52-cent rate, adjusted by the applicable small producer differential and the § 101 inflation factor, applied to sales of gas under the contract from November 9, 1978, to October 1, 1981. Accordingly, we affirm the district court's corresponding award of damages to Farmington based on the difference between this rate and the amounts actually collected by Amoco.

## II

The district court initially awarded Farmington prejudgment interest in the amount of $1,018,620.86 on its recovery of overcharges. The court determined the amount of prejudgment interest by applying a rate of 10% per annum, pursuant to N.M.Stat. Ann. § 56–8–3 (Cum.Supp.1980), to the excess amounts paid by Farmington.[20] After offsetting prejudgment interest in the amount of $237,038.60 due Amoco on its recovery of undercharges, the court made a net prejudgment interest award of $781,-582.26 to Farmington.

## A

Amoco contends the district court erred in awarding prejudgment interest to Farmington because the award disregards the clearly expressed intent of the parties that interest not accrue on overcharges and undercharges. In support of its contention, Amoco primarily relies on § II, Article IV, ¶ E of the 1961 contract which provides:

---

**20.** Section 56–8–3 [Interest rate; no written contract] states:

The rate of interest, in the absence of a written contract fixing a different rate, shall be ten percent annually in the following cases:

A. on money due by contract;

B. on judgments and decrees for the payment of money when no other rate is expressed;

C. on money received to the use of another, and retained without the owner's consent expressed or implied;

D. on money due upon the settlement of matured accounts from the day the balance is ascertained;

E. on money due upon open account after six months from the date of the last item.

If it shall be found that at any time or times Buyer has actually paid bills containing an overcharge or undercharge, then within thirty (30) days after final determination, Seller shall refund the amount of any such overcharge or Buyer shall pay the amount of any such undercharge.

Amoco argues that the words "final determination" manifest the parties' intent to preclude the accrual of interest on overcharges until 30 days after determination of the amount of such overcharge by a court of last resort. Amoco concludes that final determination occurred, at the earliest, at the entry of the district court's judgment, thereby precluding any award of prejudgment interest.

While Amoco correctly concludes that the statutory rate provided in N.M.Stat.Ann. § 56–8–3 (Cum.Supp.1980) cannot be applied where a contract forbids the accrual of interest on contractual obligations, ¶ E falls short of stating such a prohibition with sufficient exactness to preclude application of the statute. The New Mexico courts have refused to apply the statutory rate *only* in instances where a contract explicitly states that amounts due thereunder shall bear no interest or where the contract terms clearly fix a different interest rate. *Skarda v. Davis*, 84 N.M. 544, 505 P.2d 1220 (1973); *City of Clovis v. Southwestern Public Service Co.*, 49 N.M. 270, 161 P.2d 878, 884 (1945). When ¶ E is read in the context of the other sections comprising Article IV, it becomes apparent the parties contemplated that inevitable variations in Farmington's requirements for gas would necessitate periodic adjustments in amounts previously billed to and paid by Farmington.[21] Paragraph E merely allows the parties 30 days following their determination of the existence of an overcharge or undercharge to make the necessary payment before that payment becomes overdue. Nowhere in that paragraph or elsewhere in Article IV is there any indication that the parties intended to delay the due date for payment of overcharges until final judicial determination. Therefore, no prohibition of prejudgment interest on overcharges can be implied from the contract. Where a contract does not preclude interest, an award of prejudgment interest under N.M.Stat.Ann. § 56–8–3 is within the sound discretion of the trial court. *Navajo Tribe v. Bank of New Mexico*, 700 F.2d 1285, 1290 (10th Cir.1983); *O'Meara v. Commercial Insurance Co.*, 71 N.M. 145, 376 P.2d 486, 490 (1962). There has been no demonstration that the district court abused its discretion in awarding prejudgment interest.

### B

Assuming that the terms of the statute do not preclude the application of the statutory interest rate, Amoco contends the applicable rate is 6%, not 10%, as applied by the district court. In 1980, N.M.Stat.Ann. § 56–8–3 was amended to increase the statutory interest rate from 6% to 10%. Because the statute in effect when the parties executed the 1961 contract and the 1971 amendment provided for 6% interest, Amoco contends that rate became an implied term of the contract governing all future interest obligations. Amoco argues that retroactive application of the interest rate enacted by subsequent amendment to the statute is not permitted under New Mexico law and unconstitutionally impairs the parties' right to contract under the United States Constitution, article 1, section 10, and the New Mexico Constitution, article II, section 19.

We agree with Farmington's contention that the constitutional question presented by Amoco is not properly before us because Amoco failed to raise the question below. *Dothard v. Rawlinson*, 433 U.S. 321, note 1 at 323, 97 S.Ct. 2720, note 1 at

---

21. For example, ¶ B of Article IV provides for annual comparisons of the amounts of gas actually purchased by Farmington in the previous year with the amount which Farmington obligated itself to purchase. Under this paragraph, Farmington is required to pay for gas not taken.

2724, 53 L.Ed.2d 786 (1977); *United States v. Immordino*, 534 F.2d 1378, 1381 (10th Cir.1976); *Harman v. Diversified Medical Inv. Corp.*, 524 F.2d 361, 365 (10th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976); *International Union of Operating Engineers, Local 953 v. Central National Life Insurance Co.*, 501 F.2d 902, 907 (10th Cir.1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 397 (1975). We therefore decline to consider that question. However, Amoco did argue before the district court that New Mexico law requires application of the 6% interest rate, rather than the 10% rate provided in the 1980 amendment to § 56–8–3. On appeal, Amoco contends, as it did below, that the rate in effect at the time the parties executed the contract and its 1971 amendment must be applied to determine prejudgment interest. Amoco concludes that application of the 10% rate, which was enacted by subsequent amendment under New Mexico law, constitutes an impermissible retroactive application of the statute.

■ Amoco misreads New Mexico law. The New Mexico courts have held that the statutory rate of interest in effect at the time a suit is filed is applicable to determine prejudgment and postjudgment interest. *Strickland v. Roosevelt County Rural Electric Cooperative*, 99 N.M. 335, 657 P.2d 1184, 1193 (N.M.App.1982), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3540, 77 L.Ed.2d 1390 (1983); *Producers Grain Corp. v. Wilson*, 97 N.M. 33, 636 P.2d 304, 308 (N.M.App.1981); *Hillelson v. Republic Insurance Co.*, 96 N.M. 36, 627 P.2d 878, 880 (N.M.1981). We have also recognized that the date of filing an action, rather than the date of execution of a contract, determines the applicable statutory rate of interest under New Mexico law. *Navajo Tribe v. Bank of New Mexico, supra*, at 1290. The 10% rate was in effect when Farmington filed this action in 1981 and when the Amoco counterclaim was filed.

AFFIRMED.